**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Barry Goldberg, | : | |
|   Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:11-cv-0045(AVC) |
| | : | |
| Sleepy's, LLC, | : | |
|   Defendant. | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This is a wrongful termination case in which the plaintiff,

Barry Goldberg, alleges that the defendant, Sleepy's, LLC

(hereinafter "Sleepy's"), terminated his employment on the basis

of his age. It is brought pursuant to the Connecticut Fair

Employment Practices Act (hereinafter "CFEPA").[1] Sleepy's removed

this action from the Superior Court for the State of Connecticut

pursuant to 28 U.S.C. 1441(a). Sleepy's has filed the within

motion for summary judgment,[2] arguing that it is entitled to

---

[1] Conn. Gen. Stat. § 46a-60(a)(1) provides: "It shall be a discriminatory practice in violation of this section: For an employer . . . to discharge from employment any individual or to discriminate such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age . . . ."

[2] Goldberg argues that summary judgment is to be considered by the court "only when <u>all</u> discovery is complete." Goldberg contends that because a material witness to the facts surrounding his employment has not yet been deposed, summary judgment is not appropriate. On March 12, 2013, the court entered order [68], which allowed Goldberg to supplement his opposition, presumably with the testimony of the material witness. However, Goldberg failed to supplement his opposition before the deadline set by the court. Pursuant to Fed. R. Civ. P. 56(c)(3), the court need consider only the cited materials, and has made its determination accordingly.

judgment as a matter of law on all of the plaintiff's claims. For the reasons that follow, the motion is GRANTED.

## FACTS

An examination of the complaint, pleadings, local rule 56 statements, exhibits accompanying the motions for summary judgment and responses thereto, discloses the following undisputed facts:

Sleepy's is the largest specialty retailer of mattresses in the United States, with over 800 mattress showrooms across the country. Sleepy's maintains a Store Planning, Design, and Construction Department (hereinafter "Store Construction Department") to oversee store construction projects.

In July of 2005, Sleepy's hired Goldberg when he was 61-years-old as a project manager for the New England region. The Director of Construction, Richard Weinstein, selected Goldberg for the position. The President of Sleepy's, David Acker, approved Weinstein's decision to hire Goldberg. Weinstein and Acker were 62 and 48-years-old respectively, when they hired Goldberg.

As a project manager, Goldberg was responsible for inspecting potential store sites and monitoring the construction schedule provided by the contractor. There is a dispute with respect to whether Goldberg had additional job responsibilities.

According to Sleepy's, Goldberg's job responsibilities also included preparing budget estimates for the construction of new stores and ensuring that contractors' work conformed to contract documents. Specifically, Sleepy's contends Goldberg was responsible for submitting invoices, preparing purchase order requests, and tracking payments to contractors. Goldberg denies these job responsibilities. Sleepy's maintains that, as a project manager, Goldberg was not allowed to authorize a contractor to perform any work on a construction project *unless* that contractor had a purchase order. Sleepy's also contends that Goldberg was not allowed to pay contractors for work they had not yet performed. Goldberg denies these two statements, and states that Sleepy's did not actually follow these policies, but does not proffer any evidence to support his denials.

Goldberg reported to Weinstein from July of 2005 until September of 2006. In September of 2006, Weinstein resigned and Goldberg thereafter reported to Angelo Volonakis.

In Goldberg's 2007 performance review, Volonakis noted, "Within the realm of administrative duties, which includes contractor invoice processing, Barry is a 2 [out of 5]. . . Barry must improve his Administrative Skills. He has excellent PC Skills, excellent construction management skills, and for some reason there is a block when it comes to administrative

duties." The 2007 evaluation also praised Goldberg stating that, "[Goldberg] is one of the leaders of the pack in his ability to get high quality projects opened." Goldberg also cites his 2008 evaluation which indicated that Goldberg was "mastering" Sleepy's policies and procedures and that Goldberg was making "major strides in his paperwork."

On January 18, 2008, David Acker sent an email to every Sleepy's project manager, including Goldberg, that stated, "In order to keep proper control: As of this moment and forever going forward, no work or job can be authorized w/o a purchase order. No exceptions to this rule. I f [sic] we find that this rule has been violated then the culprit will be held responsible."

On March 26, 2008, Volonakis sent an email to all project managers reminding them that, "NO WORK IS TO START WITHOUT AN APPROVED PURCHASE ORDER. I REPEAT – NO WORK IS TO START WITHOUT AN APPROVED PURCHASE ORDER. If you have an emergency and need to start the work before hand, send me an email explaining the emergency and I will send you back an authorization to proceed. Within 24 hours, get all the standard documentation to Kelly for the execution of a Purchase Order. (Please note, 24 hours . . . not days, not weeks . . . hours. [sic.]"

On March 21, 2008, Sleepy's' Revere, Massachusetts location opened for business and Goldberg had been the construction manager for the Revere location. On August 20, 2008, five months after the store's opening, Goldberg sent Volankis a purchase order request for carpet work that had been completed during construction, clearly in violation of the two emails the construction managers received which prohibited any work from being completed without an approved purchase order.

On August 21, 2008, Volonakis sent Goldberg an email stating in part, "[Goldberg's] actions are unacceptable under any circumstances. This must stop immediately. I urge you to re-examine your processes and make the necessary corrections." In response, Goldberg admitted that he was aware of the policy, responsible for the incident, and that he did "screw up." Volonakis documented the warning he sent to Goldberg by placing a "Warning Notice" in Goldberg's personnel file.

Goldberg was the project manager of a store that opened on August 15, 2008.[3] Sleepy's contends that Goldberg received verbal authorization to allow for carpet work to commence without an approved purchase order. Per Volonakis' March 26, 2008 email,

---

[3] There is a dispute as to the location of the store. Sleepy's contends the store was located in Orange, Connecticut, while Goldberg contends it was located in Milford, Connecticut. The location of the store is irrelevant in deciding this motion.

project managers had 24 hours to get in the standard documentation to Volonakis if they were given verbal authorization to proceed without it. Sleepy's contends that it took Goldberg over two weeks to submit the proper documentation. Goldberg denies that he was tardy in submitting the proper paperwork to Volonakis but offers no evidence in support of his position.

Goldberg was also the project manager for a construction project on Boylston Street in Boston, Massachusetts. On September 11, 2008, Volonakis found two errors in an invoice that Goldberg had approved for the Boylston Street location. First, the total cost on the invoice was understated by $10,000. Second, Goldberg approved a 100 percent total payment for work that was not completed to the contractor when the contractor had not performed 100 percent of the work they contracted to do. Goldberg's authorization to pay the contractor for 100 percent of the work that had not yet been performed was in violation of Sleepy's policy. Yet again, Goldberg denies this incident without proffering any evidence to support his denial. Volonakis emailed Goldberg to inform him that his invoice was incorrect. Goldberg admitted that the work was not complete.

On February 5, 2008, Volonakis sent an email to every project manager, including Goldberg, stating that because he had

received inconsistent budget estimates, he prepared an estimation guide for the project managers to use going forward. Goldberg's estimates, however, remained inconsistent which suggested to Volonakis that he was not utilizing the estimation guide. August 19, 2008, Volonakis emailed Goldberg to again ask him to use the estimation guide. Goldberg does not deny receiving this email, but he does deny that Sleepy's followed a policy of using the estimation guide.

Following the 2008 economic downturn, Sleepy's reduced the number of future store openings by nearly 70 percent and correspondingly, chose to reduce staff in the Store Construction Department. On September 23, 2008, Sleepy's terminated Goldberg's employment citing his ongoing poor project administration and the need to reduce staff in the Store Construction Department. The decision to terminate Goldberg was made by Volonakis, then 60-years-old, and approved by David Acker, then 52-years-old.

In addition to terminating Goldberg, Sleepy's terminated six other employees from the Store Construction Department. The ages of the six employees that were terminated were: 30, 30, 47, 60, 61, and 66. Of the six employees terminated, it included one Shannon McGinnis. Aside from Goldberg, nineteen people were

employed in the Store Construction Department. Of those nineteen employees, seven were over age 60, and two were over age 40.

As proof that they were reducing future store openings, Sleepy's states that in 2008, they opened 98 stores, including 33 stores in the New England region. One year later in 2009, after Goldberg's termination and their implemented staff reduction, Sleepy's opened only 44 stores, 9 of which were in the New England region.

Goldberg contends that on his first day working at Sleepy's, he learned from Weinstein, that the company's Chairman, Harry Acker, told Weinstein that "he didn't want to hire anybody over 40." Goldberg learned about this alleged policy from Weinstein and that Acker never told Goldberg about this policy.

Goldberg further contends that C.B. Egan, Sleepy's' Director of Visual Merchandising, verbally indicated that she "had an issue" with Goldberg's "looks [and] age" and that Goldberg "didn't look the age that people thought [he] would be." Goldberg admits that Egan was not involved in Sleepy's' decision to terminate him.

## STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" Am. Int'l Group, Inc. v. London Am. Int'l Corp., 644 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

**DISCUSSION**

Goldberg's action is brought pursuant to the CFEPA, which makes it unlawful for an employer to terminate an individual's employment because of his or her age. CONN. GEN. STAT. § 46a-60(a)(1). Claims brought pursuant to the CFEPA are governed by the well known McDonnell Douglas burden-shifting framework. See Craine v. Trinity Coll., 259 Conn. 625, 636-37 (2002) ("When a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973).").

Under this burden-shifting framework, the plaintiff must first establish a prima facie case of age discrimination, and if the plaintiff has done so, the employer is required to offer a legitimate and nondiscriminatory business rationale for its adverse employment action. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-84 (1973)). If the employer provides such an explanation, the presumptive age discrimination dissolves and the burden shifts back to the plaintiff to show that the employer's supposed reasons are pretextual, and that age discrimination was the actual reason for the adverse action. Id.

## I. Goldberg's Prima Facie Case

To defeat a motion for summary judgment, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). "[T]he burden that must be met by an employment discrimination Goldberg to survive a summary judgment motion at the prima facie stage is de minim[i]s." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

In order for a Goldberg to establish a prima facie case of age discrimination, the plaintiff must show: (i) at the relevant time, the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the position; (iii) the plaintiff suffered an adverse employment action; and (iv) the circumstances surrounding the action give rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone substantially younger. Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).

The court assumes that Goldberg has established a prima facie case of age discrimination, in that: (i) Goldberg was in the protected age class; (ii) he was qualified to be performing the work he was doing; and (iii) he suffered an adverse

employment action when he was terminated by Sleepy's. Further the court assumes Goldberg has established an inference of age discrimination based off two performance evaluations in the record. In Goldberg's 2007 performance evaluation, Goldberg was praised as "one of the leaders of the pack in his ability to get high quality projects opened." Moreover, his 2008 performance evaluation noted that Goldberg was said to be "mastering" Sleepy's policies and procedures, and was making "major strides in his paperwork." Accordingly, the court concludes that Goldberg has established a prima facie case of age discrimination.

## II. Sleepy's' Nondiscriminatory Reason

Because Goldberg established a prima facie case of age discrimination, Sleepy's is required to offer a legitimate and nondiscriminatory business rationale for its actions. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). This nondiscriminatory business rationale must be "clear and specific." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 132 (2d Cir. 2012) (quoting Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985)). At the same time, Sleepy's' burden is not a demanding one; it need only offer a nondiscriminatory explanation for the employment decision. Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).

Sleepy's offers two nondiscriminatory reasons for terminating Goldberg. First, Sleepy's contends that Goldberg's work performance was unsatisfactory, and second, Sleepy's maintains that it was forced to reduce staff due to the 2008 economic crisis.

Sleepy's first argues that Goldberg repeatedly failed to follow company policies and clearly stated directives. Specifically, Sleepy's cites five instances where Goldberg displayed poor work performance. First, Sleepy's contends that Goldberg exhibited poor project administration because he did not comply with two emails prohibiting every project manager, including Goldberg, from allowing work to commence without an approved purchase order. Second, Sleepy's further argues Goldberg exhibited poor project administration by failing to comply with an email sent to every project manager, including Goldberg, stating that if they received verbal authorization to commence work without an approved purchase order, they must submit the standard documentation within 24 hours. Third, Sleepy's contends that Goldberg improperly tracked payments to a contractor. Fourth, Sleepy's maintains Goldberg failed to comply with company policy prohibiting a 100 percent payment to contractors who had not performed 100 percent of the work. Lastly, Sleepy's argues Goldberg exhibited poor work performance

when he failed to use an estimation guide every project manager was instructed to use.

Performance errors may serve as a legitimate and nondiscriminatory reason for the termination of an employee, Khan v. Bank of Am., N.A., 372 F. App'x 216, 217 (2d Cir. 2010), and Sleepy's has given forth several occasions where Goldberg has erred in his employment.

In response to Sleepy's first proffered nondiscriminatory reason, Goldberg either denies or contends that certain company policies were not adhered to in defense of the incidents that Sleepy's cites as their nondiscriminatory reason for terminating Goldberg. Goldberg, however, fails to support his denials with any relevant evidence.[4] Conclusory allegations and speculation may not be relied on by the nonmoving party to defeat a motion for summary judgment. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). The nonmoving party must instead offer some "hard evidence showing that its version of the events is not wholly fanciful." Id. Goldberg has failed to offer any such evidence to support his denials.

---

[4] Goldberg attempts to support his denials in the rule 56 statement with citations to statements made within his own deposition. However, the transcript cited by Goldberg for the proposition for which it is cited either offers no support or is irrelevant.

It seems clear that Goldberg, on several documented occasions, failed to follow the directives of Sleepy's, even after them being directly brought to his attention. These instances support Sleepy's nondiscriminatory purpose for terminating Goldberg.

Sleepy's next argues that Goldberg was terminated during the course of a staff reduction. Specifically, Sleepy's contends that it terminated Goldberg with the need to reduce staff during the 2008 economic crisis.

Under the CFEPA, it is not the court's duty to judge the wisdom of corporate business decisions. Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982). Thus, the court need only find that Sleepy's terminated Goldberg in furtherance of their decision to reduce, regardless of whether it made good business sense to do so.

In response to Sleepy's second proffered nondiscriminatory reason, Goldberg's contends that his termination was not the result of a staff reduction citing the fact that his workload did not diminish during the stated period of the economic downturn. In response, Sleepy's emphasizes that it decided to reduce *future* store openings, regardless of the large number of pending projects Goldberg and others were working on at the time. Goldberg's contention is without merit. First, Sleepy's

opened 24 fewer stores in the New England region for 2009 as
compared to the year prior. The fact that Sleepy's reduced so
many store openings further suggests Sleepy's was facing
financial turmoil. While Goldberg maintains he was not part of a
staff reduction, he does not proffer any evidence to further
support his contention. Second, Sleepy's terminated six other
employees, two of whom were 30-years-old, which suggests that
age did not play a factor. Again, the nonmoving party in a
summary judgment motion must offer some hard evidence to show
that its contention is not based on fantasy. D'Amico v. City of
New York, 132 F.3d 145, 149 (2d Cir. 1998). Goldberg has again
failed to supply the court with any such evidence.

Accordingly, the court concludes that Sleepy's had a
nondiscriminatory reason for terminating Goldberg.

## III. Pretext/Discrimination

Because Sleepy's has articulated a nondiscriminatory
reasons, namely Goldberg's poor work performance and Sleepy's
implemented staff reduction, the presumptive age discrimination
dissolves and the burden shifts back to Goldberg to show that
the Sleepy's' suggested reasoning was pretextual and that age
discrimination was in fact the true motive behind Goldberg's
termination. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d
456, 466 (2d Cir. 2001).

When deciding whether there is sufficient evidence of pretext, "courts must refrain from second guessing the decision-making process, but must allow the employees to show that the employer acted in an illegitimate or arbitrary manner." Montana v. First Fed. Sav. & Loan Assoc. of Rochester, 869 F.2d 100, 106 (2d Cir. 1989) (quoting Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985)). In the final phase of this burden-shifting framework, the plaintiff need not prove that age was the principal factor for the adverse employment action, but only one of the motivating factors. Carlton v. Mystic Transp. Inc., 202 F.3d 128, 135 (2d Cir. 2000).

Sleepy's argues that Goldberg's reliance on speculation, conjecture, and hearsay does not establish pretext. In response, Goldberg points to various positive comments made in his performance evaluations, including, "[Goldberg] is one of the leaders of the pack in his ability to get high quality projects opened," and that Goldberg was "mastering" Sleepy's policies and procedures making "major strides in his paperwork." Goldberg fails, however, to acknowledge that, while there are positive comments in his performance evaluations, there are also negative notations. One example can be found in Goldberg's 2007 performance evaluation in which Volonakis noted, "Within the realm of administrative duties, which includes contractor

invoice processing, Barry is a 2 [out of 5] . . . Barry must improve his Administrative Skills. He has excellent PC Skills, excellent construction management skills, and for some reason there is a block when it comes to administrative duties." Sleepy's cites this "poor project administration" as the reason for his termination during the staff reduction. Even if Goldberg was "mastering" Sleepy's policies and procedures and "making major strides" in his paperwork, the court does not find Sleepy's acted arbitrarily given the several documented instances where Goldberg failed to follow company directives even after being told more than once to adhere to them.

Goldberg also argues that upon his termination, he was replaced by a younger co-worker.[5] Although Goldberg admits he had no personal knowledge of whether he was replaced, he maintains Shannon MacInnis replaced him and took over his projects. Goldberg's contention is without merit because MacInnis was also terminated during Sleepy's staff reduction in October of 2008. Volonakis ¶ 38.

Goldberg also attempts to establish pretext by pointing to alleged ageist comments made by two of Sleepy's' staff. Goldberg

---

[5] See Craine v. Trinity Coll., 259 Conn. 625, 639 (2002) ("The most typical method used by plaintiffs to establish the fourth prong of a prima facie case is to introduce evidence that the defendant later considered, hired, granted tenure to, or promoted comparably qualified individuals not in a protected class of individuals.").

contends that on his first day working at Sleepy's, his

supervisor, Richard Weinstein (later replaced by Volonakis),

told Goldberg that Sleepy's' Chairman, Harry Acker, stated "he

didn't want to hire anybody over 40." Goldberg testified that he

learned about this alleged policy not from Acker, but from

Weinstein. First, this statement is inadmissible hearsay.[6] Thus,

Goldberg may not rely on Acker's statement to establish pretext.

In a motion for summary judgment, the nonmoving party may not

rely on inadmissible hearsay. Burlington Coat Factory Warehouse

Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985).

Second, assuming arguendo that Acker's comment was

admissible, it would not establish pretext because the comment

was not made by a relevant decision-maker. Third, Goldberg was

61-years-old when he was hired which dispels Acker's alleged

comment.

Goldberg also points to a comment made by C.B. Egan,

Sleepy's' Director of Visual Merchandising, in an effort to show

underlying age animus at Sleepy's. Goldberg alleges that Egan

verbally indicated that she "had an issue" with Goldberg's

"looks [and] age" and that Goldberg "didn't look the age that

---

[6] Fed. R. Evid. 801(c) provides: "Hearsay means a statement that the declarant
does not make while testifying at the current trial or hearing; and a party
offers in evidence to prove the truth of the matter asserted in the
statement."

people thought [he] would be." Again, Egan was not a relevant decision-maker in Goldberg's termination and her alleged comment, even if made in bad taste, does not support the claim Sleepy's is hiding behind their nondiscriminatory reasons for terminating Goldberg when his age was actually their real issue.

The court concludes that Goldberg has failed to meet his burden in showing that the nondiscriminatory reasons Sleepy's cites as its reasons for terminating Goldberg were merely pretextual and their true motivation for termination Goldberg rested on age discrimination.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED. The clerk is directed to close this case.

It is so ordered this 15th day of August 2013, at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello
United States District Judge
